UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re:<br><br>Charles Pernell Prophet and<br>Shirley Ann Prophet,<br><br>      Debtors. | Case No. 3:20-03131-dd<br><br>Chapter 7 |
| In re:<br><br>Steven Rosenschein,<br><br>      Debtor. | Case No. 2:20-03171-dd<br><br>Chapter 7 |
| In re:<br><br>Christine Marie Naughton,<br><br>      Debtor. | Case No. 20-03293-dd<br><br>Chapter 7 |

**CONSOLIDATED RESPONSE AND OBJECTION OF DEBTORS' COUNSEL TO MOTIONS OF THE UNITED STATES TRUSTEE FOR REVIEW OF THE CONDUCT OF COUNSEL, CANCELLATION OF FEE AGREEMENTS, DISALLOWANCE AND RETURN OF FUNDS PAID, AND OTHER RELIEF AS MAY BE APPROPRIATE**

Counsel to the debtors in the above-captioned chapter 7 cases, Benjamin R. Matthews and Benjamin R. Matthews & Assoc. (collectively, "Counsel"), by and through undersigned counsel,[1] submit the following consolidated response and objection to the "Motion of the United States Trustee for Review of the Conduct of Benjamin R. Matthews & Associates, Cancellation of Attorney Fee Agreements, Disallowance and Return of Fees Paid, and Other Relief as may be Appropriate with Supporting Memorandum," filed in each of the above-captioned cases (the "UST

---

[1] Admitted *pro hac vice* in each of the above-captioned cases.

Motions").[2] Other than references to the unique facts in each case, the UST Motion is more or less identical in each of the three, above-captioned cases and raises the same challenges and legal arguments. Counsel accordingly presents the Court with this consolidated response and objection to the UST Motion.

**I.     INTRODUCTION**

The Motions challenge Counsel's use of a bifurcated engagement structure to offer his clients the option of making installment payments of counsel's post-petition fees in these chapter 7 Cases,[3] and his relationship with Fresh Start Funding ("FSF"), a company that provides him with a working capital line of credit and payment management services to facilitate Counsel's provision of installment payment terms to his clients. More specifically, the Motions raise the following, specific arguments:

- that the agreements violate Local Rule 9001-1(a);

- that the fee Counsel charged is unreasonable;

- that Counsel failed to adequately disclose the arrangements relating to the payments of fees and his relationship with FSF;

- that Counsel's arrangement violates ethical rules; and,

---

[2] The UST Motion is filed as Docket Entry ("DE") 22 in the Prophet case; as DE 16 in the Rosenschein case; and as DE 12 in the Naughton case. For convenience, the separate dockets in each case hereinafter will be cited in the form "[DEBTOR LAST NAME] DE."

[3] Bifurcation is the process of entering into separate fee agreements for the pre-petition and post-petition work necessary to represent a consumer in a chapter 7 bankruptcy. It is utilized in order to minimize the up-front financial burden to a debtor to hire counsel, and to allow the debtor to make installment payments for their post-petition attorney fee. See, e.g., In re Carr, No. 19-20873 (Bankr. E.D. Ky. Jan. 22, 2020) (approving bifurcation); In re Hazlett, No. 16-30360 (Bankr. D. Utah April 10, 2019) (same); In re Slabbinck, 482 B.R. 576 (Bankr. E.D. Mich. 2012) (same); Walton v. Clark & Washington, P.C., 469 B.R. 383 (Bankr. M.D. Fla. 2012) (same); Garrison, Daniel E., "Liberating Debtors from the 'Sweatbox' and Getting Attorneys Paid: Bifurcating Consumer Chapter 7 Engagements," *ABI Journal* Vol. XXXVII, No. 6 (June 2018) (hereinafter, "Sweatbox").

- that the arrangement violates debt relief agency provisions.

None of these arguments is persuasive and the Motions should be denied.

## I. GENERAL RESPONSE TO ASSERTED FACTS

In general, Counsel concurs in the UST's explication of the organic facts related to these matters, which are concisely and accurately represented in the Motion filed in each of the Cases. Counsel maintains that certain of the facts, as discussed below, are irrelevant to the legal issues this Court must adjudicate. To the extent, however, that issues raised by the UST may require the Court to adjudicate facts, Counsel should be given the opportunity to adduce testimony— potentially from Counsel and one or more of the debtors.[4] In particular, any question of informed consent by the debtors, or reasonability of Counsel's fees, should require an evidentiary hearing.

## II. LEGAL ANALYSIS

### A. Counsel's Bifurcated Engagement Agreements Satisfy the Local Rule.

Counsel's bifurcated engagement agreements do not violate Local Rule 9011-1(b) and, in fact, the purpose of bifurcation is completely consistent with the policy basis for the Local Rule. Concluding that bifurcation violates the Local Rule would undermine the rationale for restricting limited-scope representations.

This Court should find that Counsel's bifurcated engagement agreements comply explicitly with Local Rule 9011-1(b), which provides:

> Except as may be provided in an attorney's written agreement with a party concerning appeals and adversary proceedings, any attorney who files documents for or on behalf of a party in interest shall remain the responsible attorney of record for all purposes including the representation of the party at all hearings and in all matters that arise in conjunction with the case.

---

[4] The Court's recent scheduling order and the agreement of the UST appear to concede this necessity.

L.R. Bankr. D.S.C. 9001-1(b) (the "Local Rule"). Counsel's form of agreement fully complies with the Local Rule because it explicitly contemplates a plenary representation and that Counsel only may withdraw with leave of this Court. And Counsel has, in fact, represented these three debtors throughout their respective Cases.

Counsel uses the recommended form of pre-filing and post-filing engagement agreements provided by FSF, which explicitly provide that "the Law Firm has expressed that it is ready, willing and able to represent you for your entire chapter 7 case," and that the client is not bifurcating the engagement "with the intention of having the Law Firm simply file your case and then withdraw, but instead to facilitate you making payments over time for your attorney fee so that you can have an attorney represent you through the entire chapter 7 process." Pre-Filing Agreement, ¶ 6.A at 7; Post-Filing Agreement, ¶ 6.A at 5 (a redacted copy of the Prophet Post-Filing Agreement is attached as Exhibit "A," the form of which is identical in each of the Cases, and the provisions of which are identical as between the Pre-Filing and Post-Filing Agreements). As set forth below, this distinction is critical to distinguishing bifurcation from "unbundling." Moreover, the engagement agreements further provide that if the client cancels the post-petition agreement, Counsel "will ask the bankruptcy court to allow us to withdraw as your lawyer in accordance with the bankruptcy rules, but we will continue to represent you in the case and perform all necessary services until and unless the bankruptcy court allows us to withdraw." Post-Filing Agreement, ¶ 6.H at 6.

Bifurcation also serves the same policy purposes behind rules that seek to restrict or prohibit limited scope representation. Accordingly, under well-accepted canons of statutory construction this Court should reconcile them compatibly. For example, in Reves v. Ernst & Young, 494 U.S. 56 (1990), the United States Supreme Court had to define the phrase "any note"

in the definition of "security" to determine whether a creatively structured financial instrument that was denominated a "note" was in fact a regulated security under the Securities and Exchange Act. Id. at 60-61. The Court approached the question from the perspective of Congressional purpose and intent. The Court first observed that Congress had a very broad purpose in the Act, id. at 61, but then postulated that "the phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Act." Id. at 63. Although the Court ultimately concluded that the note under review was a security, it first parsed the language and its purpose to observe that *not* all notes are securities, even though the definition in the Act listed "all notes." See id. at 60-67. Reves is a case of "latent ambiguity" where apparently simple language could have been interpreted overbroadly, but for the Court's consideration of the public policy behind the language, and a determination of whether a particular conclusion was sensible in view of the rule's intent.

The lesson from Reves is instructive here. While a straightforward reading of the Local Rule does not appear to prohibit bifurcation, any doubt about that must be resolved with reference to the purpose behind limited-scope representation or so-called "unbundling" rules. On that score, the analysis in the leading case on this topic, In re Hazlett, No. 16-30360 (Bankr. D. Utah April 10, 2019), is instructive.[5] In its discussion of whether bifurcation is legal, the Hazlett

---

[5] Although the Hazlett decision is not the first to approve of bifurcated chapter 7 engagements (see note 3, *supra*), the decision has been so well regarded as to lead the Director of the United States Trustee Program, Cliff White, to "commend that opinion" to the attention of the National Association of Bankruptcy Trustees at the 2019 annual meeting because of the "careful reasoning of the court." Clifford J. White, Director, United States Trustee Program, Keynote Address at the Annual Meeting of the National Ass'n of Bankr. Trustees (Denver, Co., August 23, 2019) (published at https://www.justice.gov/ust/speech/remarks-director-cliff-white-2019-annual-conferencenational-association-bankruptcy). Mr. White went on to note that "the court's opinion

court first distinguished bifurcation from "unbundling" or using a limited services agreement. <u>Id.</u> at 14. Observing that the "primary concern with unbundling is that the attorney provides a limited service and then leaves the client to his or her own devices to complete the legal process," the court noted in contrast that "the purpose of the bifurcated agreement is decidedly not to abandon the debtor, but to enable the attorney to be paid for the post-petition services." <u>Id.</u> (internal citations omitted). So, while under a bifurcated arrangement "debtors are given the option to proceed *pro se*," the "decision is solely up to the debtor, as the attorney is ready and willing to complete the representation upon the signing of the post-petition fee agreement." <u>Id.</u>[6] "Thus," the court concluded, "the bifurcated fee agreement is not for unbundling" and "only increases the affordability of the attorney's services and thereby increases a debtor's access to legal representation." <u>Id.</u> at 14-15.

Even more specifically, the <u>Hazlett</u> court considered and rejected an argument that a bifurcated agreement was contrary to an even more specific similar local rule that flatly prohibited limited-scope representations and further provided that "[t]he scope of representation cannot be modified by agreement." <u>Hazlett</u> at 19 (quoting L.R. Bankr. P. 2091-1 (Bankr. D.

---

provides an important four-part analysis in assessing bifurcation practices," and that "[i]t is instructive to the USTP and should be instructive to the bar as well." <u>Id.</u>

[6] The option to forego signing a post-petition agreement and instead proceed *pro se* or to hire another attorney parallel the options that a client inherently has in every engagement. Regardless of whether an engagement is bifurcated into separate agreements, and regardless of limited scope representation rules, clients inherently have the right to limit an engagement by terminating the attorney. Recognizing that the client always has this prerogative makes any suggestion that a bifurcated engagement entered into solely to facilitate a thorough, financially feasible representation violates the Local Rule seem like a stark example of "form over substance." And where an attorney wishes to withdraw from a case (for example if a client exercises their right not to sign a post-petition agreement and instead proceed *pro se*) this Court's local rules also require the court's permission, providing a more than adequate protection against an attorney failing to discharge their duty. <u>See</u> L.R. Bankr. D.S.C. 2091-1(a).

Utah)). The Hazlett court noted that:

> The intent of this rule is indeed to restrict the use of limited service agreements (unbundling) by debtor's counsel. However, as noted above, the difference with Capstone's bifurcated agreement procedure is that the law firm is willing to complete the representation, and it is only by the debtor's election that the case proceeds pro se. Debtors are free at any time to terminate a lawyer's services, so the Court does not see the use of bifurcated fee agreements as creating the problem addressed by Local Rule 2091-1.

Id. This Court should reach the same conclusion.

The Slabbinck decision (also cited in footnote 3, *supra*) similarly concluded that limited-scope representation rules and bifurcation serve the same purposes. See In re Slabbinck, 482 B.R. 576 (Bankr. E.D. Mich. 2012). The Slabbinck court considered a UST argument that the bifurcated engagement constituted impermissible "unbundling" of services in violation of the Michigan rules of professional conduct, concluding (after an exhaustive review of case law and the Michigan ethical rules) that a debtor could agree to split the engagement between two agreements with adequate disclosure. Id. at 583-89. Summarizing its conclusion, the Slabbinck court noted:

> a pre-petition agreement to pay an attorney gives rise to a dischargeable debt. A post-petition agreement does not. For the Court to insist on an all or nothing approach, in the name of promoting attorneys' competence, will have the perverse effect of depriving needy individual debtors who cannot afford to pay in advance for *all* of the legal services they may need in an a Chapter 7 case, from hiring an attorney to provide them with *any* of the legal services that they may need in a Chapter 7 case.

Id. at 597. For the Slabbinck and Hazlett courts, finding that bifurcation violated "unbundling" rules would be akin to "throwing out the baby with the bath water."

In short, the apparent purpose behind the Local Rule is to make sure that debtors have representation for their entire chapter 7 case. The entirely consistent purpose of bifurcation is to provide a way for debtors to afford representation for their entire case. Attorneys and clients do

not enter into bifurcated chapter 7 engagements to limit the services that the attorney will provide; rather, they enter into them in order to provide a way for the debtor to have the benefit of a plenary representation. Hence, this Court should resolve any perceived or potential inconsistency between bifurcation and its Local Rule in favor of approving bifurcation.

    B.  <u>Counsel's Fees in These Cases Are Reasonable under Section 329</u>.

The UST's challenge to the reasonability of Counsel's fees fails as a matter of law because the controlling lodestar standard is not even discussed, let alone applied to the facts of these Cases. Reasonableness for purposes of Section 329 is determined with reference to the standard imposed by Section 330. <u>See, e.g.</u>, <u>Am. Law Ctr., PC v. Stanley (In re Jastrem)</u>, 253 F.3d 442, 443 (9th Cir. 2001) (invoking § 330(a)(3) in review of § 329(b) order). Under Section 330, the bankruptcy court must "consider the nature, the extent and the value of such services, taking into account all relevant factors." 11 U.S.C. § 330(a)(3). "Within the boundaries of Section 330, courts usually use the lodestar standard as a means for determining the reasonableness of compensation, which is calculated by multiplying a reasonable number of hours spent on a case by a reasonable hourly rate." <u>In re Lexington Hearth Lamp & Leisure, LLC</u>, 402 B.R. 135 at 140-141 (Bankr. M.D. N.C. 2009) (<u>citing</u> <u>In re Kieffer</u>, 306 B.R. 197, 205 (Bankr.N.D.Ohio 2004)).

The Supreme Court has strongly embraced the lodestar standard for determining a reasonable attorney fee because it "is readily administrable;" it "cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results." <u>Perdue v. Kenny A.</u>, 559 U.S. 542, 130 S.Ct. 1662, 1672 (2010). In order to conduct a lodestar analysis, a trial judge must determine "the prevailing market rates in the relevant community," because the test was "[d]eveloped after the practice of hourly billing had become widespread." <u>Id.</u> The lodestar method thus produces an award that an "attorney would have received if he or

she had been representing a paying client who was billed by the hour in a comparable case." Id.

The UST does not apply this standard in its argument and instead focuses on the difference between the pay-over-time fee actually charged in each Case and i) the prepaid option offered to but not chosen by each debtor, and ii) the fees that Counsel has charged to various other debtors over time. The appropriate focus is on the lodestar value of the fee actually charged, not on what was offered to the debtor but not chosen, and not practically available to that debtor due to their circumstances. Cf., In re Hazlett, No. 16-30360 at 2, 21 (Bankr. D. Utah April 10, 2019) (attorney's $2000 post-petition fee in a bifurcated case deemed reasonable despite being nearly double the $1,200 prepaid fee that a competitor offered to the same debtor).

It is even further afield to suggest that the fee charged to these debtors should be compared to fees charged to other debtors in the past. Subject only to the limits of reasonability, Counsel is free to charge whatever a client is willing to pay, and to raise or lower his fee in a particular case as he sees fit. One case may be *pro bono*, another may involve a reduced fee, while a third might involve a premium, so long as the fee is reasonable. Bankruptcy attorneys who charge by the hour—including chapter 11 attorneys, bankruptcy litigators and even chapter 13 attorneys—regularly increase their hourly rates to meet the current market. The lodestar test is imposed in order to avoid the type of "hodge-podge" comparison that the UST promotes. The test places the focus on a market-reasonable hourly rate, and looks at the time that it reasonably takes to complete the tasks an attorney commits to provide.

Even if this Court were to consider the market range of chapter 7 flat fees to assist in determining a reasonable, market hourly rate, comparing pay-over-time flat fees to prepaid flat fees is an "apples to oranges" comparison. Because both attorneys and debtors are under

constraints in the traditional engagement structure, prepaid fees cannot be considered an indication of the fair market value of a chapter 7 debtor attorney's time. Debtors often are under unimaginable financial pressure before obtaining relief in a bankruptcy and are highly price-sensitive when faced with the nearly insurmountable task of accumulating hundreds or even thousands of dollars before they can obtain relief. Likewise, attorneys who employ a single, prepetition engagement agreement must collect their entire fee in advance or risk the unpaid balance being discharged—and are trying to collect these fees from people under severe financial distress. Consequently, prepaid chapter 7 services are highly commoditized, and attorneys are left to compete solely on price.[7] One need only consider the effective hourly rate that Counsel has charged in the past to understand that Counsel rarely receives his normal hourly rate for chapter 7 work under a traditional, prepaid structure. By the UST's own accounting, of the cases that Counsel filed in the recent past, he received as little as $975 for one case, which at his normal hourly rate of $250 would represent less than 4 hours time. If, instead, Counsel spent a much more reasonable 10 hours on the engagement, the effective, hourly rate would be $97.50, or only about 40% of the rate he usually

---

[7] In the groundbreaking 2011 Final Report that Professor Lois Lupica did on her study of consumer bankruptcy fees, she noted the financial challenges of practicing in consumer chapter 7:

> Respondents repeatedly observed a disconnect between the time it takes to responsibly represent a consumer debtor in a Chapter 7 case, and the legal fee the market will support. One attorney noted "Doing a thorough job is time-consuming, and unfortunately most debtors can't afford to pay a fee sufficient to compensate for that time." Others remarked that market fees are "depressed by attorneys . . . operating at a loss." Still another remarked, "My fee does not cover my time for most of my Chapter 7 practice. I probably represent Chapter 7 debtors because I've always done so, and as a favor to referring attorneys who refer other bankruptcy matters to me."

"The Consumer Bankruptcy Fee Study: Final Report," Lupica, Lois R. at 90 (Amer. Bankr. Inst., December 2011) found at https://abi-org.s3.amazonaws.com/Endowment/Research_Grants/CFSFinalReport_Final_Dec7.pdf (internal footnotes omitted) (hereinafter, "Lupica Report").

receives on hourly work. Cf. Lupica Report at 96 (noting the significant divergence in Chapter 13 practice between an attorney's normal hourly rate and the effective rate received in flat-fee bankruptcy matters). Once an alternative is presented for debtors to make payments over time after their bankruptcy is filed, attorneys and debtors are liberated from the constraints that commoditize attorneys and artificially drive down their fees. Debtors likewise are provided with a much more feasible way to pay for and have the benefit of thorough representation.

And, in fact, there are good reasons for there to be a difference in the fee when Counsel bifurcates the engagement and allows a debtor to pay over time. As the UST notes in the Motions, Counsel's fee disclosures to the Court explain the different work, risks and costs associated with both bifurcating the engagement, and using a third-party financing company to accommodate the client's inability to prepay a fee. See, e.g. UST Motion, ¶ 9. Similar explanations exist in the client agreements, as well. See, e.g., Prophet Post-Filing Agreement, ¶ 3.A.

In applying the lodestar analysis to a chapter 7 flat fee, consideration also must be given to the value of the services that the attorney is committing to provide, whether such services end up being needed in a particular case. This district's Local Rule generally requires an attorney who files a chapter 7 case to stand ready to provide all needed services in the case, whether they were specifically predicted or accounted for in setting a flat fee. See L.R. Bankr. S.C. 9011-1(b). It is only fair, therefore, to consider the value of the risk to the attorney that any or all of those services may be required in any given case.

Moreover, it is ethically permissible to pass on a financing charge when a client is aware of it and gives their informed consent, so long as the overall fee is reasonable.

> Some clients may be unable to afford lawyers' fees absent some form of accommodation or assistance. For example, a criminal

> defense or family law client may be unable to afford a lawyer's flat fee at the outset of a representation. The client may be able to afford the lawyer's fee, however, if the client can finance the fee through a loan from a third-party. Or, a client may simply wish to finance a lawyer's fee rather than pay a lump sum.

Formal Opinion 484, ABA Standing Committee on Ethics and Professional Responsibility, at 1. The attorney's cost of financing can be passed on to a client with adequate disclosure and so long as the overall fee remains reasonable. Id. at 10-11.

But the "bottom line" from a legal perspective is clear: if the total, flat fee charged each of the debtors is reasonable compared to the hourly value of Counsel's time, it satisfies Section 329, regardless of what costs and considerations led Counsel to set his fee at that level. This clearly is a factual matter that will have to be developed, but Counsel is confident that the lodestar value of the services he committed to provide these debtors satisfies Section 329.

C. <u>Counsel's Disclosures to the Debtors and This Court Were Robust and Satisfy All Legal Requirements</u>.

The UST incorrectly argues that Counsel's supposedly inadequate disclosure to both the debtors and the Court provides an alternative basis for disgorgement.

1. *Counsel's Compensation Disclosure More than Meets the Narrow Requirements of Section 329.*

The Bankruptcy Code imposes a simple, straight-forward obligation on chapter 7 bankruptcy attorneys: "Any attorney representing a debtor . . . whether or not such attorney applies for compensation . . . shall file with the court a statement of the compensation paid or agreed to be paid . . . and the source of such compensation." 11 U.S.C. §329(a). The purpose of the disclosure is to enable trustees and the court to assess the reasonableness of the fee charged. Section 329 is implemented through Rule 2016(b) of the Bankruptcy Rules of Procedure, which requires an attorney to file "the statement required by §329," as well as "whether the attorney has shared or agreed to share the compensation with any other entity. . . . includ[ing] the particulars of any such

sharing or agreement." Fed. R. Bankr. P. 2016(b). The requirement to disclose fee-sharing relates not to Section 329 but, instead, to Section 504, which prohibits estate professionals (which a chapter 7 attorney is not) from sharing fees with other professionals who are required to be independently approved by the court under Sections 327 or 328 of the Bankruptcy Code. Other than the requirement to disclose fee-sharing (not applicable in a chapter 7 case), Rule 2016(b) does not add substantive disclosure requirements beyond Section 329's mandate.

Oddly, the UST does not argue that Counsel adequately discloses what each debtor has agreed to pay, and how each debtor has agreed to pay such fees. Rather, the UST argues—incorrectly—that Counsel's failure to discuss how his current fee arrangements differ from those charged in the past somehow falls short of Section 329's narrow mandate. Counsel in fact exceeds the requirements of Section 329 by a wide margin.

Counsel's disclosure vastly exceeds the basic requirement of Section 329. It describes the bifurcated nature of the engagement, accounts for pre- and post-petition fees, and describes his financing relationship. As noted above, the only requirements of Section 329 are a statement of the "compensation paid or agreed to be paid . . . and the source of such compensation" 11 U.S.C. § 329(a), and Counsel has expanded the required disclosures, and vastly exceeded the minimum standards, above which he should not be sanctioned.

The remaining criticisms leveled by the UST highlight aspects of the disclosure that are not material, and that certainly do not reflect on whether the disclosure meets Section 329's basic requirement.

> 2. *The Disclosure Concerning Sharing of Compensation Does Not Relate to Chapter 7 Debtor's Counsel.*

The UST's argument that Counsel's actual source of compensation is Fresh Start Funding is wholly misplaced. As the UST correctly notes in its statement of facts, FSF has extended a line of credit to Counsel. A copy of Counsel's "Line of Credit and Accounts Receivable Management

Agreement" and related note are attached hereto as Exhibit "B" (the "Finance Agreement"). Fresh Start Funding's fee for the financing, payment management services, credit reporting, etc., is calculated as a percentage of the value of the asset securing the line of credit, i.e. the amount of the total post-petition fee receivable in each chapter 7 case which Counsel pledges to FSF to be able to make draws against the line of credit. See Finance Agreement, ¶¶ 2, 2.4 and 8.5. Counsel is responsible to pay this fee whether or not the client pays his fees to the attorney. It is a blatant mischaracterization to suggest that counsel's source of compensation is FSF—any more than to suggest that if counsel pays expenses with a credit card (the balance associated with which ultimately will be repaid with fee revenue) their "source of compensation" is Visa, Mastercard or American Express.

> D. Counsel's Use of Bifurcation and His Relationship with FSF Do Not Run Afoul of Ethical Rules.

Counsel's use of FSF's bifurcation program and his financing and payment relationship management with the company do not run afoul of ethics rules. FSF's entire program was recently reviewed by the Arizona Supreme Court's Attorney Ethics Advisory Committee, whose draft opinion approving the program has passed the public comment phase without negative feedback and is slated to be approved by the Arizona Supreme Court. Arizona's ethics rules are predicated largely on the Model Rules promulgated by the American Bar Association, as are South Carolina's in relevant part. Regardless of the draft status of the opinion or the fact that it was decided under the Arizona rules, the analysis of the Arizona ethics committee is sound and highly persuasive in its evaluation of FSF's program. A copy of the draft opinion is attached hereto as Exhibit "C" (the "Arizona Ethics Opinion").

The UST argues that bifurcation runs afoul of Counsel's duty to provide competent representation by limiting the services that are provided to debtors before the case is filed. Nothing

about bifurcation prevents attorneys from completing required diligence before filing a case, and by signing the petition in each of these Cases, Counsel has certified compliance with that requirement. The mere fact that schedules and statements are not prepared with the petition (as is allowed by Rule 1007(c)) does not mean that Counsel has failed to satisfy his duty of competent representation. See, e.g., "Sweatbox" at 66 (discussing interplay of Rule 1007 and bifurcation).

The UST also alludes to, but never fully explains, the notion that Counsel is breaching confidentiality in sharing basic debtor information with FSF. This narrow disclosure was done with the debtor's explicit consent in order to facilitate the installment payment structure that, in turn, allows these debtors to have the benefit of counsel. The UST also alludes to, but never fully explains, the notion that Counsel's bifurcation of the debtors' engagements, and his relationship with FSF create impermissible conflicts of interest. But nothing about these relationships is substantively different than the inherent tension that always exists between an attorney and their client on matters of payment. As set forth in the Arizona Ethics Opinion, these natural tensions do not run afoul of the rules.

E. Counsel's Fee Agreements and Advertising Satisfy the Requirements of Sections 526 and 528 of the Code.

The UST enumerates a litany of immaterial criticisms of Counsel's pre-filing services agreement to argue that it fails to satisfy the narrow requirements of Section 528 of the Code, and rehashes the criticisms of Counsel's disclosure of compensation to assert a violation of Section 526. Neither argument is correct.

The UST's sole argument under Section 526 is that Counsel's allegedly defective disclosure of compensation constitutes an "untrue or misleading" filing. Counsel will not repeat the arguments made above as to why this characterization is false.

Section 528(a)(1), in turn, imposes a surprisingly simple and narrow requirement. It requires only that there be a written agreement that "clearly and conspicuously" discloses the services to be provided, and the fees for such services and terms of payment. See 11 U.S.C. § 528(a)(1). The UST does a commendably good job at summarizing these exact aspects of Counsel's pre- and post-petition services agreements that debtors executed to engage Counsel.

Moreover, while the agreements are admittedly lengthy and detailed, they are clear and conspicuous in their explanation of the exact services that will be provided, the alternatives that Debtor was presented for a prepaid and a bifurcated engagement, and the terms of payment that he chose. In a recent, unpublished decision, the bankruptcy court in the District of Minnesota commented on exactly these form documents, noting as follows:

> I find that while the agreements between [counsel] and [the debtor] are lengthy and detailed, the agreements are clear and conspicuous in their explanation of the exact services that will be provided and the alternatives that [the debtor] was presented for a pre-paid and bifurcated engagement and terms of payment.

In re Ryan, Case No. 19-33190-wjf at 53-54 (Bankr. D. Minn., Sept. 30, 2020) (the "Ryan Decision," a copy of which is filed herewith as Exhibit "D").

Finally, as to the broader issue of informed consent, consumers like Debtor are legally expected to understand and make binding choices about many legal issues where the operative documents are more complicated than Counsel's engagement agreement. Consider, for example, the disclosures Congress mandated debtors receive and that they are legally presumed to understand—a compilation of which is found at Exhibit "E". Those disclosures are easily as complicated (or more so) than the engagement agreements in question here. The Minnesota bankruptcy court commented on this issue, as well:

> Further, as to the broader issue of informed consent, consumers like Ms. Ryan are legally expected to understand and make binding choices about a host of life issues where the operative documents were—are at [sic], at least, in many instances, much more complicated than [counsel's] engagement agreement.

Ryan Decision at 55. The Ryan Court went on to compare the relative simplicity of the engagement agreement to the mandatory disclosures noted above. Id.

There can be no serious question that Counsel's form of engagement agreement satisfies Section 528 of the Code. It is clear and conspicuous in its description of the services to be provided, the fee to be charged, and the terms of payment. The UST's other criticisms of the form are not relevant to Section 528.

    F.   Section 105 Does Not Provide an Independent Basis to Sanction Counsel.

This Court's power to regulate the conduct of counsel and to issue sanctions emanates from the specific provisions of the Code discussed above, and Section 105 does not provide a separate or alternative basis for the relief the UST seeks. "[A] bankruptcy court possesses only the jurisdiction and powers expressly or by necessary implication conferred by Congress." Johnson v. First Nat. Bank of Montevideo, Minn., 719 F. 2d 270, 273 (8th Cir. 1983) (citations omitted). "Although a bankruptcy court is essentially a court of equity . . . its broad equitable powers may only be exercised in a manner which is consistent with the provisions of the Code." Id. (internal citation omitted). "We have long held that 'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code." Law v. Siegel, 134 S. Ct. 1188, 1194-95 (2014) (quoting Norwest Bank Worthington v. Ahlers, 485 U. S. 197, 206 (1988)). "Section 105(a) confers authority to 'carry out' the provisions of the Code." Id. This Court should, accordingly, reject the idea that Section 105 can form a separate basis for the relief that the UST seeks and analyze the various arguments made by the UST solely under the specific sections of the Code governing the conduct and agreements in question.

## II. CONCLUSION

Counsel's fee is not unreasonable, and the UST's argument concerning that issue is predicated on a completely erroneous interpretation of the controlling standard. Counsel's

compensation disclosure, despite immaterial, ministerial errors, was robust and its substance provides no basis for this Court to levy a sanction. Counsel's use of bifurcated engagements and his relationship with FSF comply with ethics rules and the regulations imposed on Counsel as a debt relief agency. The UST Motions are not well-taken and should be denied.

RESPECTFULLY SUBMITTED this 10th day of November, 2020,

| | |
|---|---|
| /s/ *Benjamin R. Matthews* | /s/ *Daniel E. Garrison* |
| Benjamin R. Matthews (SC Dist. Ct. No. 3332) | Daniel E. Garrison, AZ Bar 021495 |
| Benjamin R. Matthews & Assoc. | Admitted *pro hac vice* |
| 2010 Gadsden St. | Protego Law, PLLC |
| Columbia, SC 29201 | 1805 N. Scottsdale Rd., Ste. 100 |
| Tel: (803) 799-1700 | Tempe, AZ 85281 |
| benrusmat@gmail.com | Tel: (480) 504-6840 |
| | dan@protegolaw.com |

## **CERTIFICATE OF MAILING**

This is to certify, under penalty of perjury, that on November 10, 2020, the foregoing was electronically filed, and also emailed to those parties in interest set forth below.

Linda K. Barr, Trial Attorney
Office of the United States Trustee
linda.k.barr@usdoj.gov