**SUPREME COURT OF ARIZONA**
**ATTORNEY ETHICS ADVISORY COMMITTEE**
**Ethics Opinion File No. EO-20-0003**

*The Attorney Ethics Advisory Committee was created in accordance with Rule 42.1 and Administrative Order Nos. 2018-110 and 2019-168.*

---

A lawyer does not violate the prohibition on fee-sharing by participating in a fee-financing arrangement in which a lender will retain a portion of the lawyer's fees. To pass along the cost of the fees retained by the lender to the client, the lawyer must disclose the nature and details of the charge. The lawyer must also reveal the existence of alternative payment options and the merits and drawbacks of those alternatives. At all times, the lawyer's fee must remain reasonable. Provided the lawyer obtains the informed consent of the client, the lawyer may disclose information necessary to facilitate a fee-financing arrangement to a lender. The lawyer must inform the client of the full range of consequences presented by the disclosure of client-related information to a third party, including the possible waiver of attorney-client privilege. The lawyer has a continuing obligation to ensure that information disclosed to a lender is not misused or disclosed to unauthorized individuals. Fee-financing arrangements raise several potential conflicts of interest, and the lawyer must acquire the client's informed consent, confirmed in writing, to waive these conflicts if a significant risk of them occurring is present. In the consumer bankruptcy context, the lawyer's duty of candor requires disclosure of all relevant details concerning a fee-financing arrangement to the bankruptcy court.

## FACTUAL BACKGROUND

An Arizona bankruptcy practice funds its operations through a fee-financing arrangement with a lender. Under the terms of the arrangement, the lender provides the practice with advances on a line of credit on a per-case basis, eventually advancing 75% of the total amount of fees payable in connection with each case. In exchange, the lender retains 25% of the legal fees to cover financing and collection-management services, and the practice assigns the accounts receivable to the lender. The practice's fee agreements disclose the existence of this arrangement as a payment option, and if clients opt for the arrangement, they are required to pay the lender in monthly installments over varying lengths after the bankruptcy petition is filed. Several other notable provisions of the fee-financing arrangement include: (1) an agreement that the advances are with recourse to the practice, meaning the practice is liable for any amount the lender is unable to recover from the practice's clients; and (2) to facilitate the lender's collection activities, the practice provides the lender with copies of the fee agreement, payment authorization, pay stubs, bank account statements, and other personal information related to the collection of payments.

There is a dispute over whether a lawyer can ethically participate in the fee-financing arrangement described above, and, if so, the scope of a lawyer's ethical duties under the Rules of Professional Conduct while participating in such an agreement.

## QUESTIONS PRESENTED

1. Does a fee financing arrangement that provides for the lender to retain a portion of the lawyer's fee constitute impermissible fee sharing?
2. May a lawyer pass financing and collection fees charged by a lender onto a client, and, if so, what must the lawyer disclose concerning their fee?
3. May a lawyer disclose information concerning the client to a lender to facilitate a fee-financing arrangement?
4. What conflicts of interest may arise in fee financing-arrangements?
5. What are lawyers' ethical duties regarding the bankruptcy court when entering a fee-financing agreement?

## APPLICABLE ARIZONA RULES OF PROFESSIONAL CONDUCT ("ER")

### ER 1.0 Terminology

\*\*\*

(e) "Informed consent" denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct.

\*\*\*

### ER 1.4 Communication

(a) A lawyer shall:
> (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in ER 1.0(e), is required by these Rules;

\*\*\*

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

\*\*\*

**Comment**

**Explaining Matters**

[5] The client should have sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued, to the extent the client is willing and able to do so. Adequacy of communication depends in part on

the kind of advice or assistance that is involved. . . . The guiding principle is that the lawyer should fulfill reasonable client expectations for information consistent with the duty to act in the client's best interests, and the client's overall requirements as to the character of representation. In certain circumstances, such as when a lawyer asks a client to consent to a representation affected by a conflict of interest, the client must give informed consent, as defined in ER 1.0(e).

**ER 1.5 Fees**

(a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:
> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer
> (3) the fee customarily charged in the locality for similar legal services
> (4) the amount involved and the results obtained
> (5) the time limitations imposed by the client or by the circumstances
> (6) the nature and length of the professional relationship with the client
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services and
> (8) the degree of risk assumed by the lawyer.

(b) The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client in writing, before or within a reasonable time after commencing the representation, except when the lawyer will charge a regularly represented client on the same basis or rate.

\*\*\*

**ER 1.6 Confidentiality of Information**

(a) A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted or required by paragraphs (b), (c) or (d), or ER 3.3(a)(3).

\*\*\*

**ER 1.7. Conflict of Interest: Current Clients**

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

\*\*\*

    (2) there is a significant risk that the representation of one or more clients will be materially limited . . . by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if each affected client gives informed consent, confirmed in writing, and:
    (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client:
    (2) the representation is not prohibited by law; and
    (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal.

**ER 1.8 Conflict of Interest: Current Clients: Specific Rules**

\*\*\*

(e)  A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that:
    (1)  a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter . . . .

\*\*\*

(f) A lawyer shall not accept compensation for representing a client from one other than the client unless:
    (1) the client gives informed consent;
    (2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and
    (3) information relating to representation of a client is protected as required by ER 1.6.
\*\*\*

**ER 2.1 Advisor**

In representing a client, a lawyer shall exercise independent professional judgment and render candid advice. In rendering advice, a lawyer may refer not only to law but to other considerations such as moral, economic, social and political factors, that may be relevant to the client's situation.

**ER 3.3. Candor Toward the Tribunal**

(a) A lawyer shall not knowingly:
    (1) make a false statement of fact or law to a tribunal . . . .

\*\*\*

**ER 5.4. Professional Independence of a Lawyer**

(a) A lawyer or law firm shall not share legal fees with a nonlawyer . . . .

\*\*\*

(c) A lawyer shall not permit a person who . . . pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services.

## RELEVANT ARIZONA ETHICS OPINIONS

State Bar of Arizona, Rules of Professional Conduct Committee, Opinion Nos. ("Ariz. Ethics Op. __") 01-07, 98-05, 94-11, 92-04, 89-10, 71-34, 70-20.

## OTHER RELEVANT ETHICS OPINIONS AND AUTHORITY

ABA Committee on Ethics and Professional Responsibility, Formal Opinion No. 484 ("ABA Formal Op. 484") (Nov. 2018) ([Full Text Here](#)).

Maine Board of the Overseers of the Bar Professional Ethics Commission Opinion 193 ("Maine Op. 193") (Dec. 2007) ([Full Text Here](#)).

State Bar of Nevada, Standing Committee on Ethics and Professional Responsibility, Formal Opinion No. 36 ("Nevada Op. 36") (Jan. 2007) ([Full Text Here](#)).

New York State Bar Association, Committee on Professional Ethics, Formal Opinion No. 2018-5 ("New York Op. 2018-5") (July 2018) ( ([Full Text Here](#)).

State Bar of North Carolina, 2018 Formal Ethics Opinion 4 ("North Carolina Op. 4") (Apr. 2018) ([Full Text Here](#)).

State Bar of Oregon, Formal Ethics Op. 2005-133 ("Oregon Op. 2005-133") (Revised 2016) ([Full Text Here](#)).

State Bar of Utah, Ethics Advisory Opinion Committee, Opinion No. 17-06 ("Utah Op. 17-06") (Aug. 2018) ([Full Text Here](#)).

State Bar of Utah, Ethics Advisory Opinion Committee, Opinion No. 97-11 ("Utah Op. 97-11") (Dec. 1997) ([Full Text Here](#)).

Virginia State Bar Standing Commission on Legal Ethics, Advisory Opinion 1764, ("Virginia Op. 1764") (May 2002) ([Full Text Here](#)).

Daniel E. Garrison, *There's No Such Thing As Too Much Information: Disclosure of Bifurcation and Financing in Chapter 7 Cases*, 38-JUL Am. Bankr. Inst. J. 20 (2019) ([Full Text Available on Westlaw](#)).

Adam D. Herring, *Problematic Consumer Debtor Attorneys' Fee Arrangements and the Illusion of "Access to Justice"*, 37-OCT Am. Bankr. Inst. J. 32 (2018) ([Full Text Available on Westlaw](#)).

American Bankruptcy Institute, *Final Report of the ABI Commission on Consumer Bankruptcy* (2019) ([Full Text Here](#)).

Steven Garber, Rand Institute for Civil Justice, Law, Finance and Capital Markets Program, *Alternative Litigation Financing in the United States: Issues, Knowns, and Unknowns* 7–16 (2010) (Occasional Paper series) ([Full Text Here](#)).

American Bar Association Commission on Ethics 20/20, *Informational Report to the House of Delegates* (2012) ([Full Text Here](#)).

# OPINION

The topic addressed in this opinion stands at the nexus of two recent developments within the legal system of the United States that each present heady ethical issues for lawyers today.

The first is the rise of third-party litigation funding, dubbed "alternative litigation finance," or "ALF," by the American Bar Association ("ABA"), in the United States. The numerous and evolving types of ALF arrangements defy a single definition. Still, the ABA characterizes them most generally as "mechanisms that give a third party (other than the lawyer in the case) a financial stake in the outcome of the case in exchange for money paid to a party in the case." American Bar Association Commission on Ethics 20/20, *Informational Report to the House of Delegates* 5 (2012). These transactions often involve sophisticated financial entities and have been the subject of many studies, praise, criticism, and scrutiny by the legal community, including various states' ethics committees. *Id.* at 1–2, nn.1–4 (collecting commentary and ethics opinions on the subject); *see also* Steven Garber, Rand Institute for Civil Justice, Law, Finance and Capital Markets Program, *Alternative Litigation Financing in the United States: Issues, Knowns, and Unknowns* 7–16 (2010) (Occasional Paper series) (describing the ALF industry).

The second is the current state of the law in the federal bankruptcy system, particularly the law governing chapter 7 consumer bankruptcies. Due to language within the Bankruptcy Code and caselaw interpreting it, lawyers offering representation in chapter 7 cases face significant hurdles in collecting fees for their services. *See* Chrystin Ondersma, *Small Debts, Big Burdens*, 103 Minn. L. Rev. 2211, 2231–38 (May 2019) (providing a summary of the history and present situation surrounding these hurdles). These challenges have incentivized consumer bankruptcy lawyers to require up-front retainers to represent potential chapter 7 debtors, a cost that is impossible for many individuals contemplating bankruptcy to afford. *See* Hon. Henry Callaway & Jonathan Petts, *Too Broke for a Fresh Start*, 38-FEB Am. Bankr. Inst. J. 24, 24 (2019). The situation is aptly summarized by a recent report compiled by the American Bankruptcy Institute:

> How consumers pay for legal representation in bankruptcy is one of the most important issues facing the bankruptcy system. Consumers who cannot pay either cannot access the bankruptcy or must file pro se, and studies show pro se filers get inferior outcomes. Another study suggests consumers are increasingly using "no money down" chapter 13 cases that allow payments of their attorney's fees through

> the chapter 13 plan, although such filers end up paying more and are
> less likely to receive a bankruptcy discharge. A bankruptcy system
> that works only for those who can pay for legal representation does
> not further the American ideal of equal justice under law.

American Bankruptcy Institute, *Final Report of the ABI Commission on Consumer Bankruptcy* 89–90 (2019) (footnotes omitted); *see also In re Hazlett*, No. 16-30360, 2019 WL 1567751, at *5-7 (Bankr. D. Utah Apr. 10, 2019) (expressing concerns with the current state of the chapter 7 bankruptcy system).

The confluence of these developments has resulted in the increasingly prevalent use of fee-financing arrangements with third-party financers to provide consumer bankruptcy lawyers with immediate payment and debtors an opportunity to delay paying the fees until after a discharge of debt is received.[1] Scrutiny of this practice abounds, however, and critics contend these fee-financing arrangements are designed to benefit lawyers primarily, not debtors, and that they encourage improper behavior such as the inflation of fees and the use of deceptive practices to convince debtors to agree to the arrangements. Adam D. Herring, *Problematic Consumer Debtor Attorneys' Fee Arrangements and the Illusion of "Access to Justice"*, 37-OCT Am. Bankr. Inst. J. 32, 58–59 (2018); *see also* American Bankruptcy Institute, *supra* at 91 (expressly disapproving "fee factoring agreements between debtors' counsel and third-party collectors"). This scrutiny has triggered significant litigation within the bankruptcy courts. *See, e.g.*, *In re Carr*, 613 B.R. 427, 434–42 (Bankr. E.D. Ky. 2020); *In re Milner*, Case No. 19-11539-SAH, 2019 WL 8161155, at *14–23 (Bankr. W.D. Okla. Dec. 12, 2019), *Hazlett*, 2019 WL 1567751, at *11–12; *In re Wright*, 591 B.R. 68, 89–96 (Bankr. N.D. Okla. 2018).

By addressing the ethical questions presented by the fee-financing arrangement detailed above, the Committee aims to provide useful guidance to lawyers preparing to or already navigating the troubled waters generated by the use of fee-financing arrangements in consumer bankruptcy proceedings in Arizona. We conclude that fee-financing arrangements with features akin to the arrangement at-issue here are not *per se* unethical, but present numerous ethical issues that lawyers must carefully resolve to avoid running afoul of the Rules of Profession Conduct. Lawyers must assess their ability to participate ethically in a fee-financing arrangement—whether it be one that resembles the arrangement considered here or something different—on a

---

[1] The rise of fee-financing arrangements in consumer bankruptcy cases is hand-in-hand with the increased use of "bifurcated" fee agreements, which call for clients to enter two separate fee agreements—one before the petition for bankruptcy is filed, and one after. Adam D. Herring, *Problematic Consumer Debtor Attorneys' Fee Arrangements and the Illusion of "Access to Justice"*, 37-OCT Am. Bankr. Inst. J. 32, 58 (2018). Under the pre-petition agreement, the lawyer agrees to file a "skeletal" petition for little or no fee. After the skeletal petition is filed, the client and lawyer enter a second fee agreement that covers a broad range of services, including services that might, in usual circumstances, be done before the petition is filed. *Id*. The goal of the bifurcated fee model is to avoid discharge of the debt owed for the lawyer's services. *Id*. Because the ethical propriety of such agreements was not raised in the opinion request, however, we do not address them further in this opinion.

case-by-case basis, and must they adhere to the principles of professional independence, adequate disclosure, candor, and informed consent when participating in such an arrangement.

1.  **Does a fee-financing arrangement that provides for the lender to retain a portion of the lawyer's fee constitute fee-sharing?**

Subject to limited exceptions, a lawyer cannot "share legal fees with a nonlawyer." ER 5.4. Because the fee-financing arrangement described in the opinion request provides that the lender will retain 25% of the advance proceeds used to pay the lawyer's fee, an issue arises whether such an arrangement constitutes impermissible fee-sharing. An Arizona ethics opinion, Op. 98-05, concluded that an agreement between a finance company and a lawyer to purchase a client's account receivable violated ER 5.4(a) because the company would "recoup [a] discounted portion of the client's account receivable." At least one other jurisdiction has applied the same rationale to a hypothetical like the arrangement contemplated here. *See* Virginia Op. 1764 ("The committee opines that, in line with those opinions, while the attorney may arrange for the client to pay interest to the finance company, the attorney may not agree to provide the finance company with a portion of his fee."). However, Arizona has also long held that a lawyer does not commit impermissible fee-sharing by permitting clients to pay fees owed with a credit slip or credit card, even where the issuing bank will retain a percentage of the amount paid. In Arizona Ethics Opinions 70-20 and 71-34, both concluded that a credit card payment plan did not violate the ethical prohibition on fee-sharing, even though the lender would keep a percentage of the lawyer's fee. The opinions found that the "financing charges to the bank [were] for financial services rendered" that could be segregated from the receipt of the lawyer's fee. Arizona Ethics Opinion 89-10 likewise concluded that a credit card financing plan did not violate ER 5.4(a) because "the lender act[ed] merely as a collection agency for the attorney's fee."

We find Arizona Ethics Opinion 98-05 unpersuasive regarding the situation before us here, for two reasons. First, Opinion 98-05 addressed fee-sharing in the context of an *outright sale* of a lawyer's accounts receivable for a discounted price and did not involve a loan or advance of funds. The fee-financing arrangement at-issue here, however, concerns a discount for financial and collection-related services charged to an *advance* drawn from a line of credit and *secured* by the assignment of a lawyer's accounts receivable. These facts render the arrangement more akin to a credit card financing plan, which have consistently been found not to constitute unethical fee-sharing. And viewing a discount charged in a fee-financing arrangement as distinct from the types of agreements that constitute fee-sharing aligns with the opinion of the ABA and several other jurisdictions. *See* ABA Formal Op. 484 (when finance company charges a financing or subscription fee, it "is basically an administrative fee that is deducted from the payment to the lawyer"); Utah Op. 17-06 ("Sale or encumbrance of accounts receivable is not sharing fees with a non-lawyer."); Oregon Op. 2005-133 (prohibition on sharing fees "does not prohibit [a] [l]awyer from using a nonlawyer to collect legal fees, even when the nonlawyer is paid from collected fees").

Second, an ER 5.4(a) analysis does not turn only on whether a discount or financing fee is paid out of the lawyer's legal fees in one or more cases. The purpose of ER 5.4(a) is "to protect the lawyer's professional independence of judgment," ER 5.4 cmt. 1, not to broadly prohibit

lawyers from using them to pay for services that aid in their practice. For example, several jurisdictions have held that fee-financing arrangements that *condition repayment* of an advance or loan on either the recovery of fees or the recovery of a specific amount of fees violate the purpose of ER 5.4(a) because the lender is given a stake in the outcome of the litigation that will incentivize it to try and influence the lawyer's independent judgment. New York Op. 2018-5, at 5–6; Maine Op. 193; Utah Op. 97-11. Because the arrangement here was with recourse to the lawyer, "there is no implicit or explicit understanding that the debt will be repaid only if legal fees are obtained in particular matters, and the creditor may seek repayment out of all of the [lawyer's] assets." New York Op. 2018-5; *see also* Nevada Op. 36 ("Where a loan is not contingent on litigation success but is a conventional recourse loan that must be repaid irrespective of the outcome of the litigation it financed, courts and bar associations have generally approved such arrangements."). Accordingly, we conclude such arrangements do not violate ER 5.4(a), even if they require a lawyer to pay a portion of their fee to the lender for financing- and collection-related services.

2.  **May a lawyer pass financing and collection fees charged by a lender onto a client, and, if so, what must the lawyer disclose concerning their fee?**

The fee-financing arrangement described in this opinion raises two ethical questions concerning the fee charged under such arrangements. First, may a lawyer include the amount retained by the lender in their fee? Second, if a lawyer can, what disclosures must they make to a client regarding such charges and the fee generally? ER 1.5(a) provides that a "lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount of expenses." In entering into a fee agreement with a client, a lawyer must communicate to the client in writing "the basis or rate of the fee and expenses for which the client will be responsible." ER 1.5(b). A lawyer must also "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." ER 1.4(b); *see also* ER 1.4 cmt. 5. When a lawyer wishes to pass charges not associated with their services onto a client, the lawyer must inform the client of the details to the extent reasonably necessary to allow the client to make an informed decision concerning whether to agree to pay those expenses. Ariz. Ethics Op. 01-07.

If a fee-financing arrangement requires that a discount or service charge be deducted from the lawyer's accounts receivable, the lawyer may only pass that charge onto the client if his or her fee remains reasonable. Utah Op. 17-06. Like all other lawyers, a consumer bankruptcy lawyer participating in a fee-financing arrangement remains subject to the factors governing the reasonableness of a fee outlined in ER 1.5(a). *Id.*

The lawyer must also inform the client of the nature and details of the charge. Ariz. Ethics Op. 01-07. If passing the service charge or discount onto the clients causes a lawyer to charge a higher fee for a fee-financing arrangement than other fee arrangements, the lawyer must inform the client of that fact. ABA Formal Op. 484. In other words, a potential client cannot give informed consent to a fee-financing arrangement without information concerning where the fees will be allocated and whether selecting that arrangement will result in a greater expense to the client than an alternative fee arrangement. ER 1.0(e) (informed consent requires "adequate information" and information on "available alternatives"); ER 1.4(a). No matter the reasonableness of the fee charged, a lawyer may not conceal expenses unrelated to the legal services it agrees to provide a client or fail to provide the client with information concerning other fee arrangements. The lawyer

must convey this information to the client in as clear, direct, and simple manner as possible. ER 1.0(e); ER 1.4 cmt. 5; *see also Milner*, 2019 8161155, at *15–18 (holding fee agreements void where lawyer's fee structure led the court to "seriously doubt[] that [the] [d]ebtor fully understood her rights or her obligations and to whom they were owed"). If these requirements are met and the client, now properly informed, gives their consent to bear the cost of the charge, the lawyer may then account for the charge in their fee, so long as the overall fee remains reasonable.

3. **May a lawyer disclose information concerning the client to a lender to facilitate a fee-financing arrangement?**

Because the fee-financing arrangement here involves furnishing the lender with information concerning clients—including copies of the fee agreement, payment authorization, pay stubs, bank account statements, and personal information related to the collection of payments—we must next determine whether a lawyer may disclose such information to a third party. The disclosure of such information falls within the scope of ER 1.6(a), which provides that "[a] lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent."

Several past Arizona ethics opinions have concluded that a lawyer may disclose information such as a list of their accounts receivable, including the name of the person or company owning the account, the account balance, and the age of the account, to a bank to facilitate acquiring a line of credit or to assist a collection agency in collecting delinquent fees. Ariz. Ethics Op. 94-11; Ariz. Ethics Op. 92-04; Ariz. Ethics Op. 89-10. Arizona Ethics Opinion 98-05, on the other hand, concluded the sale of a client's account receivable to a finance company created an ER 1.6(a) violation that could not be waived by client consent. The opinion's chief concern was the fact that, under the terms of the proposed agreement at-issue in that opinion, the company was permitted, in its sole discretion, to resell the accounts receivable it purchased from the lawyer in the marketplace. The opinion found:

> The lawyer could not conceivably anticipate and communicate to the client all of the factual permutations and legal implications of such a sale to a factor. It is unlikely any lawyer could assess the uncertainty of client accounts receivable being sold into the secondary market replete with the time cards, file, correspondence, legal memoranda, and all other confidential matters relating to the client, sufficiently, for the client to appreciate the significance of what he is being asked to do.

However, we again find the rationale of Opinion 98-05 unpersuasive because the disclosures contemplated by a fee-financing arrangement such as the one at-issue here are not nearly so broad or far-reaching. The lender is not purchasing accounts receivable that can then be resold in a secondary market. Instead, the lender acts as the financer of a line of credit and a collection service for the accounts receivable assigned to it as security for the loans. Thus, the lender has no right to engage in the activities that would lead to disclosures the lawyer could not possibly "anticipate and communicate to the client." Instead, the disclosures involved here fall within the types of disclosures long found ethically permissible in Arizona, subject to the requirement that the lawyer obtains informed consent from the client to disclose the information to the lender. And this

conclusion aligns our interpretation of ER 1.6(a) in this context with those adopted by the opinions of several other jurisdictions, including Utah, Oregon, and the ABA. Utah Op. 17-06; Oregon Op. 2005-133; ABA Formal Op. 484.

Thus, ER 1.6 permits a lawyer to disclose information of the type described here to a lender provided they obtain the client's informed consent. In receiving the client's informed consent, however, we note that the lawyer must take care to inform the client of the full range of consequences that may result from the disclosure of financial information related to the representation, including the potential waiver of attorney-client privilege. ABA Formal Op. 484. The lawyer must also be aware that assigning the accounts receivable to a lender does not obviate their responsibility to limit the disclosure of information falling within the ambit of ER 1.6. *See* Ariz. Ethics Op. 94-11 ("[A] lawyer is legally and ethically responsible for the conduct of the agents of a collection agency and may not 'assist or induce' another to act unethically, if a lawyer does turn over delinquent accounts to a collection agency.").

4. **What conflicts of interest may arise in fee-financing arrangements?**

Next, we identify several potential conflicts of interest that may arise during the execution of the fee-financing arrangement contemplated here. ER 1.7(a)(2) provides that a concurrent conflict of interest exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to . . . a third person or by a personal interest of the lawyer. ER 1.8(a) likewise provides that a lawyer "shall not . . . knowingly acquire a[] . . . pecuniary interest adverse to a client . . . ." We address each conflict of interest we have identified in turn.

First, a conflict of interest is present from the fact that, under the terms of the fee-financing arrangement presented here, the advances issued by the lender are recourse loans as to the lawyer, meaning the lawyer can be held liable for any fees the lender fails to recover from the client. The recourse nature of the arrangement places the lawyer in a position directly adverse to the client's should the client be unable to pay the lender or dispute some aspect of the lender's collection activities. This, in turn, raises the possibility that the lawyer will place their personal financial and pecuniary interest in avoiding liability for the client's unpaid fees ahead of the client's interests. *See* ER 1.7(a)(2); ER 1.8(a). Prior Arizona ethics opinions considering third-party financing arrangements have consistently stated that the arrangements must be without recourse to the lawyer to avoid such conflicts of interest. *See* Ariz. Ethics Op. 98-05; Ariz. Ethics Op. 89-10; Ariz. Ethics Op. 70-20. However, these opinions did not address whether a conflict arising out of a recourse loan could be waived under ER 1.7(b) and ER 1.8(a).

We conclude that a lawyer wishing to enter into a fee-financing arrangement with a client and a lender that involves an advance or loan with recourse to the lawyer must comply with the process for waiving the conflicts of interest presented by such an arrangement under both ER 1.7(b) and ER 1.8(a). To properly acquire the client's informed consent, confirmed in writing, the lawyer must inform the client of the nature and details of the recourse loan and of the possibility that the lawyer's judgment could be affected by the threat of liability. Nevada Op. 36 ("Counsel should explain that incurring debt in connection with a case could affect counsel's assessment of

what constitutes reasonable resolution of the case and thus affect counsel's advice to the client regarding settlement.").

Second, a conflict of interest may arise from the financial incentives a fee-financing arrangement may provide a lawyer. ER 1.7(a)(2). As stated in ABA Formal Opinion 484: "[T]he . . . risk is that the lawyer will recommend the finance company or broker to the client even though fee financing is not in the client's interests because the client's arrangement of financing best assures payment or timely payment of the lawyer's fee." *See also* Oregon Op. 2005-133. Again, the conflict may be waived by the client, provided the lawyer complies with the waiver provisions of ER 1.7(b). But a lawyer will avoid the conflict altogether if they refrain from recommending a fee-financing arrangement to a client but instead first present it as one of several payment options for the client to consider. ABA Op. 484; North Carolina Op. 4. If the client expresses interest in a fee-financing arrangement, the lawyer may then supply more detailed information with little fear that they have placed a thumb on the scale in favor of one payment option over the other.

Third, a conflict of interest could arise out of a lawyer's interest in maintaining a business relationship with a lender. *See* Ariz. Ethics Op. 01-07. To the extent that a significant risk exists that a lawyer's continuing relationship with a lender will create a conflict between the interests of the client and the lawyer's interests, the lawyer must comply with the requirements of ER 1.7(b) and do so promptly. ER 1.4(a).

A lawyer entering a fee-financing arrangement, such as the one contemplated here, must be alert to the possibility of several conflicts of interest. Nevertheless, in each instance, the client may give informed consent to the representation even in the face of such conflicts provided the requirements contained within ERs 1.7(b), 1.8(a), and 1.8(f) are satisfied.

5. **What are lawyers' ethical duties regarding the bankruptcy court when entering a fee-financing agreement?**

Finally, we consider whether the Rules of Professional Conduct require a consumer bankruptcy attorney entering a fee-financing arrangement such as the one contemplated here to disclose the nature and details of the arrangement to the bankruptcy court. ER 3.3(a)(1) provides that an attorney shall not knowingly "make a false statement of fact or law to a tribunal . . . ." Comment 3 to the rule further explains that:

> an assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry. There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation.

In every bankruptcy case, the debtors' counsel must submit a statement to the court disclosing the source of any compensation paid or agreed to be paid to counsel. 11 U.S.C. § 329(a); Fed. R. Bankr. P. 2016(b); *Wright*, 519 B.R. at 89–90. These responsibilities are critical to the bankruptcy process, and the bankruptcy court is empowered to review these disclosures and the reasonableness

of the fee charged. 11 U.S.C. § 329(b); Fed. R. Bankr. P. 2017. As summarized succinctly by the Bankruptcy Court for the Northern District of Texas:

> The honest and comprehensive disclosure of compensation payments plays a vital role in maintaining the integrity of the bankruptcy system. Moreover, it is only upon full and complete disclosure of compensation payments under section 329(a) of the Bankruptcy Code and Rule 2016 that this court is able to review and determine whether such payments were excessive under section 329(b) of the Bankruptcy Code and Rule 2017 . . . . Because of the importance of this process, a bankruptcy court retains the power, authority, and duty to police the disclosure and reporting requirements set forth in the Bankruptcy Code and Rules with its sanctioning powers, including the power to order the disgorgement of all sums received by counsel and the forfeiture of all compensation paid to counsel in a particular case.

*In re Netoche Brigham Fair*, Case No. 15-33400-SGJ-13, 2016 WL 3027264, at *13 (Bankr. N.D. Tex. May 18, 2016) (footnotes omitted); *see also Wright*, 591 B.R. at 95 ("This Court has previously noted the bankruptcy system is a fragile one, built on the principles of full and candid disclosure. Its operation and survival rely on the integrity and professionalism of its practitioners." (footnote omitted)). Given the affirmative obligation placed on debtors' counsel in bankruptcy proceedings to disclose any source of compensation paid or agreed to be paid counsel in connection with the proceedings, a lawyer who knowingly fails to disclose the use of a fee-financing arrangement to the bankruptcy court not only risks sanctions under the bankruptcy code and rules but also would violate their ethical duty of candor under ER 3.3(a)(1).

To avoid violating their ethical duty of candor to the tribunal, lawyers must disclose the nature and details of a fee-financing arrangement to the bankruptcy court. As stated by the Bankruptcy Court for the Western District of Oklahoma: "'Disclosure, disclosure, disclosure,' should be every debtor's counsel's mantra . . . ." *Milner*, 2019 WL 8161155, at *14; *see also* Daniel E. Garrison, *There's No Such Thing As Too Much Information: Disclosure of Bifurcation and Financing in Chapter 7 Cases*, 38-JUL Am. Bankr. Inst. J. 20, 68 (2019). To aid lawyers in understanding the level of disclosures required, the Committee recommends lawyers heed the lessons found within the numerous recent bankruptcy court decisions addressing this issue. *See, e.g.*, *Carr*, 613 B.R. at 434–42; *Milner*, 2019 WL 8161155, at *14–20; *Hazlett*, 2019 WL 1567751, at *11–12; *Wright*, 591 B.R. at 89–96.

## CONCLUSION

Although fee-financing arrangements akin to the one considered here are not *per se* unethical under the Rules of Professional Conduct, they present numerous pitfalls that lawyers must take care to avoid. Lawyers must maintain their professional independence and remain vigilant for conflicts of interest when engaging in such arrangements. They must also provide clients with the information necessary to make an informed choice to participate in a fee-financing arrangement, including detailed explanations of the nature and details of their fee, the availability of other options, and the information to be disclosed to the lender. These explanations must be

presented in a direct, simple, and concise manner. In the consumer bankruptcy context, lawyers must affirmatively disclose the existence and details of a fee-financing arrangement to the bankruptcy court.

DRAFT